**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| | : | |
| SUSAN SMITH, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | NO. 12-6032 |
| | : | |
| EAST PENN MANUFACTURING, INC., | : | |
| Defendant. | : | |

_____

Henry S. Perkin, M.J.                                                          August 8, 2014

## MEMORANDUM

This matter is before the Court on Defendant East Penn Manufacturing, Inc.'s Motion for Summary Judgment filed March 4, 2014. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment was filed April 2, 2014. With leave of Court, Defendant's Reply Brief in Support of its Motion for Summary Judgment was filed April 11, 2014. Having reviewed and considered the contentions of the parties, the Court is prepared to rule on this matter.

Plaintiff, Susan Smith ("Mrs. Smith"), alleges that Defendant, East Penn Manufacturing, Inc. ("East Penn"), violated her rights by creating a hostile work environment and quid pro quo sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e which prohibits Sexual Discrimination and Sexual Harrassment, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. Section 951, which prohibits Sexual Discrimination and Harrassment.

## I.      JURISDICTION.

The Court has jurisdiction over Mrs. Smith's federal claims pursuant to 28 U.S.C.

§ 1331, and over her state-law claim pursuant to 28 U.S.C. § 1367(a).

## II.    STANDARD OF REVIEW.

Pursuant to Rule 56(a), summary judgment is proper where there is no genuine issue of material fact.  FED. R. CIV. P. 56(a).  In viewing the evidence in the light favorable to the non-moving party, summary judgment will be granted against a party who does not make a sufficient showing to establish "an element essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986).

The moving party carries the initial burden to inform the court of the basis for its summary judgment motion; to produce evidence to establish a prima facie case as to each element; and to identify the absence of no genuine issue of material fact.  *Id.*  When the non-moving party cannot establish an essential element and there is "no genuine issue as to any material fact," the moving party is entitled to summary judgment as a matter of law.  *Id.* at 322.

Material facts are those that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  Mere factual disputes will not preclude summary judgment when they are irrelevant to the outcome of the suit.  *Id.*  An issue is "genuine" if a reasonable trier of fact could return a favorable verdict for the non-moving party.  *Mengel v. Reading Eagle Co.*, CIV.A. 11-6151, 2013 WL 1285477 (E.D. Pa. Mar. 29, 2013), *appeal dismissed* (Oct. 30, 2013)(citing *Anderson*, 477 U.S. at 248).

To defeat summary judgment, the non-moving party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(c).  Moreover, the non-moving party cannot rely on unsupported assertions, conclusory allegations,

or mere suspicions to survive a summary judgment motion.  *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)(citing *Celotex*, 477 U.S. at 325).  Where the non-moving party will have the burden of proof at trial, the moving party can make a showing that there is an "absence of evidence to support the non-moving party's case."  *Jones v. Indiana Area Sch. Dist.*, 397 F. Supp.2d 628, 642 (W.D. Pa. 2005)(quoting *Celotex*, 477 U.S. at 325).

III.    **BACKGROUND**.

East Penn is a manufacturer of batteries and related products with its corporate office and largest manufacturing and distribution facilities located in or near Lyon Station, Berks County, Pennsylvania.  East Penn employs approximately 7,800 employees throughout the United States, including approximately 5,800 in Pennsylvania.  East Penn has a distribution facility in Topton, Pennsylvania (the "Topton Distribution Center"), where at all times material to this action, Mrs. Smith was employed.  Mrs. Smith was hired for a full-time position on the third shift in Automotive Plant A2 in August, 2005.  Her job title was Enveloper Series I.  (Mot. Summ. J., Ex. B.)  When Mrs. Smith was hired she went through East Penn's New Hire Orientation Program, during which she received a copy of all of East Penn's personnel policies, including its Policy on Sexual and Other Unlawful Harassment (the "Policy").  *(Id.*, Ex. C.)  As is the case with all new hires, these policies were reviewed with her during the orientation process.  *(Id.*, Ex. D.)

In January, 2007, Mrs. Smith was the successful bidder for a third shift Dry Line position as a battery labeler/packager at the Topton Distribution Center.  *(Id.*, Ex. E.)  Steven Moser was in the Leader position at the Topton Distribution Center when Mrs. Smith transferred there.  Moser started at East Penn in January, 2003 in a production job.  (Moser Dep. at 27.)  In

January, 2006, he bid on and was awarded the Leader position of the Dry Line and Utility operations at the Topton Distribution Center on the third shift, which generally lasted from 11 p.m. to 7 a.m. (Mot. Summ. J., Ex. F; Moser Dep. at 86.) Sue Willman was the Foreperson on the third shift at the Topton Distribution Center at that time. (Moser Dep. at 63; Willman Dep. at 10-11.) Mrs. Smith and Moser did not know each other when she transferred to the third shift Dry Line and Moser had no involvement with Mrs. Smith's transfer. Approximately thirty employees worked on the third shift in the Dry Line and Utility Departments. (Moser Dep. at 80.) Mrs. Smith and Moser worked together for approximately the next two years until December, 2009 without incident, including any sexual encounters. (Compl., ¶ 8.)

In or about November, 2007, Mrs. Smith's husband was diagnosed with a carcinoid tumor in his airway near his lung. (Jason Smith Dep., pp. 26-27.) He underwent surgery but did not have to undergo any chemotherapy or other treatment regimen and was in remission. (*Id.*). In December, 2009, Mr. Smith was diagnosed with a cancerous tumor in his colon, he had surgery to remove the tumor and also underwent a regimen of chemotherapy that lasted for six months. (*Id.* at 27-29.) His treatment ended at that time. (*Id.*) While undergoing chemotherapy, he was bedridden the entire time. (*Id.* at 30.) During the six month chemotherapy regimen, Mrs. Smith started to drink heavily. (*Id.* at 31.) Her mind was affected and she was "bouncing off the walls" and "wasn't doing good." (*Id.* at 33-34.)

In or about December 2009, Mr. Smith's cancer worsened, causing Mrs. Smith severe emotional distress and vulnerability. (Compl., ¶ 11.) During this period of alleged vulnerability, Mrs. Smith claims that Moser flirted with her and began to make sexual overtures towards her. (*Id.*, ¶ 12.) According to Mrs. Smith, Moser and she engaged in consensual sexual

relations approximately 40 times from in or about January, 2009 until in or about June, 2010.[1] (Compl. ¶ 13; Moser Dep., pp. 108-111, 122.)  Mrs. Smith was 42 years of age when the sexual relationship began and Moser was 24 years old at that time.

The sexual relations always involved oral sex, which each performed on the other. (Smith Dep. at 99-101,121-125; Moser Dep. at 127-128.)  Most of the sexual liaisons took place at the Topton Distribution Center, although several times they had sexual relations during the daytime in Moser's vehicle while parked in a supermarket parking lot and at his home when his wife and children were at work and daycare, respectively.  (Smith Dep. at 99-101, 121-125; Moser Dep. at 127-128, 144-145.)

Mrs. Smith admitted to her treatment counselor, John F. Mitchell, M.D., that she was a willing participant in these sexual encounters with Moser.  (Mot. Summ. J., Ex. G.)  She further admits that she initiated such encounters with Moser at least 25% of the time.  (Smith Dep. at 163, Moser Dep. at 108-111, 122.)  Mrs. Smith further admits that she was free to say no to Moser's requests as well as not show up for scheduled rendezvous with Moser.  (Smith Dep. at 110-112.)  No one else at East Penn was aware of their sexual relationship during the 18 month period it lasted.  (Mot. Summ. J., Ex. H.)  Finally, after 18 months, she decided to break off the affair with Moser and Moser was okay with her decision and they remained friends.  (Smith Dep. at 120, 127-128; Moser Dep. at 124-125.)

As Leader, Moser had no authority to issue a Violation Notice to employees. (Snyder Dep. at 7-8; Willman Dep. at 8-10; Moser Dep. at 81-82, 113-114, 153-155; Merkey

---

[1]        Moser testified that there were far fewer such encounters, and that the sexual relationship lasted only between November, 2009 and February, 2010.  For purposes of this Motion, East Penn concedes that Mrs. Smith's version of the number of such encounters and the duration of time over which they occurred is undisputed.

Dep. at 62-63.)  In his case, if an employee committed a Group I violation, Moser would write up

the incident on a form, then discuss the matter with the employee. ( *Id.*)  The employee and

Moser would then sign the form, at which point Moser would pass the form up the chain of

command for further action, if any.  (*Id.*; Loy Dep. at 58-60; Merkey Dep. at 62-63; Tellerico

Dep. at 11-12.)  Moser never had any further involvement in the matter after that point.  (*Id.*)  On

one occasion, for example, Mrs. Smith was the subject of the documentation process prepared by

Moser for a minor mistake involving the mislabeling of some batteries that were being prepared

for shipment.  (Smith Dep. at 64; Moser Dep. at 6-7.)   Plaintiff testified that she never received

any adverse employment action from Moser.  (Smith Dep. at 64-65.)

    Moser's job duties and responsibilities as a Leader were to prepare and prioritize

the "NAPA" and "Walmart" job orders for that shift and place them in bins from which the Dry

Line workers would pick them out to fulfill, and then during the course of the shift monitor the

completion of this work.  (Willman Dep. at l3-14; Moser Dep. at 69-71, 74-77, 79, 99-102.)

Another aspect of his job was to answer employees' job-related questions and address any

job-related problems.  (Moser Dep. at 72-73, 77-78; Kroninger Dep., pp. 20, 24-26.)  Moser also

helped to train new employees on the Dry Line and discuss their trial period evaluations prepared

by Willman with her.  (Moser Dep. at 82-85.)

    The employees on the Dry Line generally worked in pairs and stayed together as

partners on every shift until such time as circumstances required one or both employees to

choose a new partner.  (Moser Dep. at 75, 77-78; Willman Dep. at 21-22.)  The daily routine was

such that the Dry Line employees were mainly self-directed.  In that regard, the Dry Line had

developed a system in which the teams picked the orders in a random fashion, i.e., they did not

know what type of order they had to work on until picked from the order bins.  (Moser Dep. at 75-76; Loy Dep. at 19-20; Kroninger Dep. at 20-26, 56-57; Merkey Dep. at 50-52.)   Another way in which the work was evenly distributed among the teams was to employ a rotation system, in which each line of the Dry Line operation, for example, would be scheduled to rotate through "NAPA" orders during shift assignment.  (Willman Dep. at 23; Moser Dep. at 21-24; Kroninger Dep. at 20-26, 54-56; Merkey Dep. at 54-55.)  In January, 2010, Moser replaced Willman as the Foreperson of the Dry Line and Utility Departments on the third shift.  (Mot. Summ. J., Ex. R; Moser Dep. at 64.)  Moser's job duties and responsibilities expanded as Foreperson in that he assumed responsibility for all job orders, not just NAPA and Walmart orders.  (Moser Dep. at 93.)

The sexual encounters continued between Mrs. Smith and Moser after Moser became Foreperson.  (*Id.* at 104-105.)  Mrs. Smith never received any adverse employment action from Moser while Moser was the Foreperson.  (*Id.*)  In that regard, Moser never made a threat to coerce or promise to induce Mrs. Smith to engage in sexual relations with him.  (*Id.*)  Likewise, Mrs. Smith never suffered any diminution in her wages and benefits.  Nor were any other terms and conditions of her employment ever adversely affected before, during or after the sexual relationship with Moser.  Smith never expressed to her husband that she had any fear of an adverse employment action by Moser.  (J. Smith Dep. at 82-85.)  According to Mr. Smith, because his wife was "out of her mind" during this time, Moser was responsible for keeping Alex Yoder and other male co-workers away from her, and East Penn was responsible for keeping Moser away from his wife.  (*Id.* at 47-49.)  In or about June, 2010, Mrs. Smith claimed she discontinued the sexual encounters with Moser because she realized it was wrong and she had

7

not been thinking clearly due to her mental state.  (Smith Dep. at 117-119; 125-126.)

  East Penn had no knowledge of Mrs. Smith's alleged mental state or alleged vulnerability until receipt of the EEOC Charge of Discrimination in late October, 2010.[2]  Mrs. Smith made no attempt to make anyone else at East Penn aware of her sexual liaisons with Moser until months after the relationship with him ended.  In fact, East Penn only first became aware of the situation when it received a letter from her attorney on or about October 25, 2010. (Mot. Summ. J., Ex. J; Snyder Dep., pp. 22-23.)  At no time during the alleged period during which the sexual encounters took place or even after they ended did she ever avail herself of the protections and remedies available to her under East Penn's Policy.  (Smith Dep. at 79; 83-84; 98; 101-102; 153.)

  After ending her sexual relationship with Moser, Mrs. Smith began a consensual sexual relationship with Alex Yoder, who also worked on the third shift at the Topton Distribution Center.  (*Id.* at 132-139.)  The sexual relationship with Yoder continued until late July, 2010.  (*Id.*)  Early on the morning of July 29, 2010, Mr. Smith received a phone call at home. (J. Smith Dep. at 33-39.)  At first the caller refused to identify himself but later in the conversation revealed that he was Albert Boyer, one of Smith's co-workers on the third shift Dry Line.  (*Id.*)  Boyer told Mr. Smith that he should know that what Smith was doing to him was not right because she was having an "affair" with Yoder.  (*Id.*)  Boyer made no mention of Smith's sexual relationship with Moser.  (*Id.*)  Mrs. Smith was still at work (working overtime)

---

   [2]  While Smith may have taken some medical or FMLA leave during the relevant time period, the requisite medical leave paperwork is not provided to the East Penn personnel department.  (Snyder Dep. at 17, 20.) Rather, FMLA paperwork goes through East Penn's medical department that is independent of the personnel office and East Penn contracts with a third party administrator to handle FMLA approvals.  (*Id.*)

at that time and was completely unaware of the phone call.  Mr. Smith did not confront Mrs.

Smith about the Boyer phone call until later that day.  (*Id.* at 40-41.)  Mrs. Smith denied to her

husband that she was having an affair with Yoder.   (*Id.* at 41-42.)  At that point Mr. Smith

became enraged at Mrs. Smith and physically assaulted her.  (*Id.* at 42-43.)  The police were

called to their home and Mr. Smith was arrested and incarcerated.  (*Id.*)  He was released from

jail on bail around 1 a.m. the next morning and returned home. (*Id.* at 42-44.)  Mr. and Mrs.

Smith had another discussion at that time about the Boyer phone call during which Mrs. Smith

admitted to having sexual relations with Yoder.  (*Id.* at 43-46.)  According to Mr. Smith, she had

engaged in sexual relations with Yoder because he was being nice to her.  (*Id.* at 45.)  Mr. Smith

husband also believed that there were other reasons for the Yoder relationship, such as his

illness, his inability to financially support their family, and Mrs. Smith resenting him for the

family's unsatisfactory state of affairs.  (*Id.* at 46.)  Mrs. Smith never told her husband that she

had the relationship with Yoder because she felt vulnerable.  (*Id.*)

        About this same time, Mr. Smith told her that he wanted to go to the Topton

Distribution Center to speak with Moser because he believed that Moser was responsible for

keeping male co-workers away from Mrs. Smith while he was ill from the effects of the

chemotherapy regimen.  (*Id.* at 47-49.)  Mrs. Smith insisted to her husband that he not do this

because she did not want anything happening at work.  (*Id.* at 49-50.)  At this point, Mr. Smith

still did not know about Mrs. Smith's sexual relationship with Moser.  (*Id.* at 50.)

        Around 11:45 a.m. the next morning, July 30, 2010, Mrs. Smith called Alison

Snyder, Personnel Director for East Penn, to report that someone (with a male voice) had called

her home the day before at 7:05 a.m. while she was still at work. (Mot. Summ. J., Ex. K.)  She

told Snyder that her husband answered the phone and was told that she was having an affair with Alex Yoder, a co-worker of hers.  Mrs. Smith told Snyder that she believed one of two co-workers, Albert Boyer or Debbie Noll, was responsible for the phone call.  (*Id.*)  Mrs. Smith denied to Snyder that she was having an affair with Yoder.  (*Id.*)  Since this matter occurred outside of work, Mrs. Smith told Snyder that she understood that East Penn was very limited in what it could do to help her.  (*Id.*)  Nevertheless, Snyder told Mrs. Smith that East Penn would try to investigate the matter.  (*Id.*)  In that regard, East Penn interviewed Boyer, who denied that he had made the phone call.

At no time while reporting this incident to Snyder did Mrs. Smith mention anything about her sexual relationship with Moser, let alone that such relationship was unwelcome by her. (Snyder Dep. at 24-25; Smith Dep. at 140-141.)  A couple of days after Mrs. Smith reported this incident to Snyder, Yoder abruptly quit his employment with East Penn without any notice or explanation.  (Snyder Dep. at 26.)  Earlier that day at approximately 1:00 a.m., Mrs. Smith spoke with Moser on the telephone to report the same incident and told Moser that the anonymous call had caused trouble at home.  (Mot. Summ. J., Ex. L.)  She also told him that her husband had gotten physical with her and wanted to come to the Topton Distribution Center to speak to Moser.  (*Id.*)  When Moser asked Mrs. Smith why her husband wanted to talk to him, she replied that it was because Moser was her boss.  (*Id.*; J. Smith Dep. at 47-49.)  She abruptly ended the phone call by saying that she had to go and hung up.  (*Id.*)

A week or two later, Yoder's girlfriend called Mrs. Smith's cell phone and left threatening messages, which Mr. Smith listened to.  (J. Smith Dep. at 51-52.)  Mr. Smith then called Yoder's girlfriend and they discussed the affair between Mrs. Smith and Yoder.  (*Id.* at

10

52-53.)  Yoder then called Mr. Smith and apologized to him.  (*Id.* at 53-54.)  Mr. Smith believed

that the reason Yoder quit his job abruptly was because of Yoder's fear that Mr. Smith would

assault him at work.  (*Id.* at 54-55.)

      In late August, Yoder's girlfriend left a voicemail on Mr. Smith's cell phone in

which she stated that Mrs. Smith was having an affair with Moser.  (*Id.* at 62-63.)  Mr. Smith

confronted Mrs. Smith about this message.  (*Id.* at 58.)  As a result of this confrontation, the

police were called and Mr. Smith was arrested a second time for assaulting his wife.  (*Id.* at

58-59.)  Mr. Smith denies that he assaulted Mrs. Smith and claimed that the police report and

statement taken from Mrs. Smith describing herself being choked by him were false because Mrs.

Smith was "out of her mind."  (*Id.* at 58-60.)  Mr. Smith was incarcerated for seven days before

being released on bail.  (*Id.*)

      At this time, Mr. Smith wanted to speak with Moser to obtain a written apology

from him.  (*Id.* at 68.)  He told Mrs. Smith to tell Moser what he wanted Moser to do.  (*Id.*)  Mrs.

Smith complied with Mr. Smith's demand and relayed the message to Moser.  (*Id.*)  Moser told

Mrs. Smith that he would not comply with her husband's demand for a letter of apology.  (*Id.* at

68-69.)  However, after receiving calls from Mr. Smith which he refused to answer, Moser did

call him in late August, 2010 when, coincidentally, Mr. Smith was with his minister at church.

(*Id.* at 71-72.)  At his minister's suggestion, Mr. Smith tried to lead Moser to church and God

during his conversation with Moser.  (*Id.* at 70-73.)  In the same conversation, Mr. Smith also

threatened to find Moser and kick his ass.  (*Id.* at 73; Moser Dep. at 146.)  Mrs. Smith also

apologized to her husband about the sexual relationship with Moser.  (*Id.* at 73.)  She told him

repeatedly that it happened because she was out of her right mind but never said to him that a

feeling of vulnerability was the reason.  (*Id.* at 74.)

Despite Mrs. Smith's mental and emotional state during the time period of her sexual encounters, she continued to show up for work, meet East Penn's attendance requirements, perform her job at a satisfactory level, collect a paycheck, support Mr. Smith and their children, maintain their home and perform the normal tasks of daily life.  (*Id.* at 74-77.)  In or about August, 2010, Mr. Smith called Snyder to request a transfer for his wife.  He testified: "I wanted [Snyder] to get Susan out of third shift because I told her there were too many men whores working there and I wanted her on day shift." (*Id.* at 78-79.)

Immediately after East Penn received the letter and attachment (the EEOC Charge of Discrimination) from Mrs. Smith's attorney on October 26, 2010, Snyder and Robert Harrop, SPHR, Vice President for Personnel at East Penn, met with Mrs. Smith that night at 11:00 p.m. at the start of the third shift. (Mot. Summ. J., Ex. H; Snyder Dep. at 21-22.)  Snyder opened the meeting by informing Mrs. Smith that East Penn had received the letter and a copy of an EEOC Charge that she had filed against East Penn.  (*Id.*)  Snyder asked her if she would be willing to discuss the situation because this was the first time that East Penn had become aware of these allegations and they were very concerned.  (*Id.*)  Mrs. Smith agreed to discuss the situation with them.  (*Id.*)  At that point, Snyder reviewed the statement from July 30th that Mrs. Smith had given documenting a conversation on the phone between her and Snyder concerning the anonymous phone call placed to her home on July 29th while she was at work.  (*Id.*)  Mrs. Smith confirmed that the statement was accurate.  (*Id.*)  Snyder then asked her why she had not reported the sexual encounters with Moser at that time.  (*Id.*)  Mrs. Smith replied that she was afraid, but did not offer any reason(s) as a basis for her fear at that time.  (*Id.*)

Mrs. Smith then provided Snyder and Harrop a narrative of the events surrounding her sexual encounters with Moser. (*Id.*) She stated that she and Alex Yoder had a "slight thing" that led to her sexual relationship with Moser.[3] (*Id.*) She said that Yoder's girlfriend had called Mr. Smith and told him about her Mrs. Smith's relationship with Yoder. (*Id.*) She said that Yoder had spoken to Mr. Smith about her relationship with Yoder and also the relationship that she had with Moser. (*Id.*) Plaintiff stated that Yoder had apologized to her husband and that she had in turn apologized to Yoder's girlfriend. (*Id.*) She then stated that Mr. Smith then looked at her phone records and discovered numerous phone calls with Moser. (*Id.*) She went on to say that in July, 2010 she had wanted to give Moser a "heads up" that her husband had found out about their relationship and that he might come to the Distribution Center to confront him about it. (*Id.*) She also stated that in July her husband had physically assaulted her and had been incarcerated twice over the anonymous phone call and her sexual relationships with Yoder and Moser. (*Id.*) She told them that she never told anyone at the Topton Distribution Center about her relationship with Moser. (*Id.*) When asked by Harrop if she knew the reason for Yoder's abrupt departure from East Penn in early August without notice, she replied that she did not know. (*Id.*)

Mrs. Smith next told them that the sexual encounters with Moser started in or about January, 2009. (*Id.*) She told them that at first he had flirted with her. (*Id.*) According to Mrs. Smith, initially their sexual relationship at work took place mostly on Friday nights when she was working overtime and the Foreperson, Susan Willman, was not at work. (*Id.*) Mrs.

---

[3]   During Smith's deposition, she admitted that the affair with Moser preceded her affair with Yoder. (Smith, Tr. p. 155)

Smith told them that Willman had no knowledge of their sexual encounters.  (*Id.*)  She then told them that on many occasions she had been assigned to work in the "NAPA" area at the back of the Distribution Center where few people ever visited.  (*Id.*)  She said that she and Moser could "disappear" in that part of the Distribution Center and it would not be noticeable to others when she worked in that area.  (*Id.*)  She told them that all of her sexual encounters with Moser involved oral sex performed by her on him.[4]  (*Id.*)

She told them that the first sexual encounter occurred in January, 2009 in the maintenance area and on other occasions in the office, label room, lunchroom and a small room by the locker room in T1.  (*Id.*)  She told them that during this first encounter Moser had kissed her and opened his pants.  (*Id.*)  She said no at first, but then gave into his request for oral sex because she was afraid.  (*Id.*)  She did not tell them why she was afraid.  (*Id.*)  She went on to state that on most occasions Moser would approach her to engage in sexual relations but that there were occasions when she initiated the sexual encounters.[5]  (*Id.*)  She also told them that on a few occasions they had sexual encounters outside of work, including during the daytime twice in the Weis Market parking lot in Kutztown and another time at his home while his wife was at work and his children were at school.  (*Id.*)  She told them that the sexual encounter at his home happened right before Thanksgiving, 2009 and described for them where he lived.  (*Id.*)  When she was asked if she had ever received any disciplinary action from Moser, she replied that she was never concerned at all about losing her job during this time and that he had only written her

---

[4]        Contrary to Mrs. Smith's claim that she only performed oral sex on Moser, she admitted in her deposition that Moser reciprocated oral sex on her as well.  (Smith Dep. at 99-101, 116, 121-125; Moser Dep. at 127.)

[5]        Mrs. Smith testified that she initiated at least 25% of the encounters with Moser.  (Smith Dep. at 163.)

up for one minor quality issue many months ago.  (*Id.*)

   She told them that some of her co-workers would make comments to her about Moser, including one time by Boyer, who said, "You get the good work because you are blowing the boss," and "You spend more time talking to [Moser] than doing work."  (*Id.*)  Mrs. Smith then told them that in September 2010, Moser had called her husband one morning around 9:00 a.m. and admitted to a few of the sexual encounters.  (*Id.*)  She said that her pastor was a witness to the telephone conversation and was "guiding" her husband, who asked Moser for an apology. (*Id.*)  She told them that Moser told her husband that Moser's wife was also aware of the relationship between him and Mrs. Smith.  (*Id.*)

   Mrs. Smith said she was very vulnerable at the time of the relationship because she was taking medication for depression, was not thinking clearly and was deeply depressed about her husband's illness.  (*Id.*)  She also said that she had gone through alcohol rehab in December, 2009 and was very vulnerable, and felt that Moser had taken advantage of her at that time.  (*Id.*)

   Harrop asked Mrs. Smith if anyone in management at East Penn was aware that she and Moser had been engaged in the sexual relationship.  (*Id.*)  She replied no.  Harrop also asked her if anyone at East Penn, whether management or employees, had witnessed or were made aware of any of these sexual encounters between her and Moser.  She replied that no one was aware of their relationship to her knowledge. (*Id.*)  At this point, Mrs. Smith told them that Moser did not have knowledge of the Charge of Discrimination she filed with the EEOC against East Penn. (*Id.*)  She told them that she now realized that all of this should not have happened and that her husband was the only man in her life for her entire marriage.  (*Id.*)  She said that this

situation had caused her much emotional distress and that her children knew about it.  (*Id.*)  She

said that she had tried to commit suicide on two occasions because of this situation.  (*Id.*)  She

then ended the meeting with them by saying that she would be willing to provide phone records

to corroborate her allegations and added that there were no text messages between her and

Moser.  (*Id.*)

Later that night Snyder and Harrop met with Moser.  (Mot. Summ. J., Ex. M.)

Harrop told him that East Penn had received a letter and an attachment that was a Charge of

Discrimination filed with the EEOC against East Penn by Mrs. Smith alleging sexual harassment

at the hands of Moser.  (*Id.*)  Moser responded that he had no idea what Harrop was talking

about.  (*Id.*)  Harrop stated to Moser that the Charge was a very serious situation and asked him if

he was involved in a relationship with Mrs. Smith.  (*Id.*)  At that point, Moser admitted that they

had "fooled around a little bit" but denied that he had had sex with her.  (*Id.*)  He then went on to

state that he and Mrs. Smith had engaged in oral sex twice in the parking lot of the Weis Market

in Kutztown and one time at his house.  (*Id.*)  He said that these episodes had happened between

November and December, 2009.  (*Id.*)

When asked how the sexual relationship had started, Moser replied that he and

Mrs. Smith had numerous conversations on the telephone and at work in which she complained

about her husband to him.  (*Id.*)  He said that no one other than he and Mrs. Smith knew of their

sexual encounters at the time.  (*Id.*)  He admitted to a telephone conversation with Mr. Smith

in early September, 2010 and that his wife also knew about the relationship with Mrs. Smith.

(*Id.*)  He said he had this telephone conversation with Mr. Smith only because Mr. Smith had

called him on several occasions and kept telling him that he (Mr. Smith was going to track him

16

down if Moser did not return the calls.  (*Id.*)  Moser said that he was worried that Mr. Smith

would show up at work.  (*Id.*)  In that regard, in or about September, 2010, Mr. Smith came to

the Topton Distribution Center while Mrs. Smith and Moser were at work and tied dozens of

Mrs. Smith's thong underwear to Moser's vehicle.[6]  (J. Smith Dep. at 82-88.)  Moser said that

during the phone conversation, Mr. Smith asked him when and where the sexual encounters had

taken place and Moser told him.  (*Id.*)  Mr. Smith then told Moser that he was at church and on

his cell phone, but did not mention that his minister was listening.  (*Id.*)  Moser also said that

Mr. Smith told him that he wanted to find Moser and kick his ass.  (*Id.*)  Moser thought that Mrs.

Smith was making these allegations against him now because she recently had been unsuccessful

in bidding on two Foreperson positions and blamed him, although Moser had nothing to do with

the fact that she was unsuccessful.  (*Id.*)

      Moser then told them that the sexual relationship took place between November,

2009 and February, 2010.  (*Id.*)  He also said that Mrs. Smith wanted to meet more often but he

could not because of his work schedule and family commitments.  (*Id.*)  Moser told them that he

was aware that Mr. Smith had cancer but reiterated that Mrs. Smith complained about Mr. Smith

to him all the time.  (*Id.*)  Moser then told them that Mrs. Smith had had a sexual relationship

with Yoder after their relationship had ended and possibly with another man that she talked about

but did not identify.  (*Id.*)  Moser told them that he did not know why Yoder quit abruptly

without notice in early August, 2010 and had no contact with Yoder since he left East Penn.  (*Id.*)

      At that point, Snyder reviewed the documentation that Moser had prepared on

---

[6]    Smith's husband took this action to get back at Moser and believed that it had the effect of making Moser "so scared he wasn't going to do nothing to [Plaintiff]."  (J. Smith, Tr. p. 88.)

July 30, 2010 concerning the phone call that Mrs. Smith had made to him about the anonymous call to her home on July 29th while she was at work. (*Id.*) Moser admitted to them that he had informed Adonis Illiano, the Topton Distribution Center Manager, immediately about the situation but did not inform him or anyone else of his prior sexual relationship with Mrs. Smith. (*Id.*) With respect to any actions that could have led to discipline against Mrs. Smith, Moser stated that he had not written her up for anything other than a "first piece infraction" that was a very minor matter. (*Id.*) Finally, he told them that he always rotated the work fairly between the employees whose work he directed, including Mrs. Smith. (*Id.*).

As a result of the investigation, East Penn terminated Moser's employment later in the day on October 27, 2010. (Mot. Summ. J., Ex. N; Snyder Dep. at 34-35; Moser Dep. at 151-152.) Mrs. Smith did not receive any discipline for her involvement with Moser, even though under East Penn's Code of Conduct she could have been discharged for engaging in sexual relations in the workplace, because East Penn believed that Mrs. Smith was likely to file a retaliation claim against East Penn if any such action was taken. (Snyder Dep. at 36-37.) Instead, she continued to work at the Topton Distribution Center until December, 2010, when she requested a transfer from the Topton Distribution Center. East Penn accommodated her request and transferred Mrs. Smith to a first shift Floater position in Injection Molding Plant 2. (Mot. Summ. J., Ex. O.) In April, 2012, Mrs. Smith requested and was granted a transfer back to the Topton Distribution Center to a first shift position on the Dry Line as a battery labeler/packager, her previous job there. (*Id.*, Ex. P.) To date, Mrs. Smith continues to be employed by East Penn in that position and she has not reported any incidents of retaliation or related matters to East Penn management.

**IV.**    **DISCUSSION.**

    **A.**    **Title VII Claim.**

        A plaintiff can make out a claim of sexual harassment two ways: (1) by establishing that the defendant subjected her to a hostile work environment; or (2) by establishing the existence of a *quid pro quo*, i.e., "a tangible employment action result[ing] from a refusal to submit to a supervisor's sexual demands." *Kelleher v. Dunham D&M, LLC*, No. 08-05277, 2009 WL 3381562, *4 (E.D. Pa. Oct. 15, 2009)(quoting *Burlington Indus, Inc. v. Ellerth*, 524 U.S. 742,753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).  In this case, Smith has pled both a hostile work environment and a *quid pro quo* sexual harassment claim.

        1.    <u>Whether Plaintiff Can Establish That She Was Subjected To A Hostile Work Environment under Title VII</u>.

        Mrs. Smith alleges that she was subjected to a hostile work environment.  To establish a gender-based hostile work environment claim against East Penn, Mrs. Smith must prove five elements: (1) she suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability.  *Mandel v. M&Q Packaging Corp.,*, 706 F.3d 157, 167 (3d Cir. 2013).  Mrs. Smith must also show that East Penn knew or should have known of the alleged discriminatory conduct and failed to take preventive or corrective actions.  *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  "Harassment which does not alter the 'terms, conditions, or privileges' of one's employment, however, reprehensible it may be, does not run afoul of Title VII.'" *Phillips v. Donahoe*, No. 12-410, 2013 WL 5963121, *6

19

(W. D. Pa. Nov. 7, 2013) (quoting *Howard v. Blalock Electric Service, Inc.*, 742 F. Supp.2d 681, 689 (W.D. Pa. 2010)).  "In order for 'an atmosphere of sexual harassment or hostility to be actionable' under Title VII, 'the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Phillips*, 2013 WL 5963121, *6 (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-47, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 I 06 S.Ct. 2399 (1986))).  Mrs. Smith must establish that the conduct at issue was both objectively and subjectively offensive, i.e, that a reasonable person would find the work environment to be hostile or abusive and that she in fact perceived it to be so.  *Faragher*, 524 U.S. at 787.

In order to establish conduct that is sufficiently severe or pervasive, it must create an "objectively hostile or abusive work environment- an environment that a reasonable person would find hostile - an environment the victim-employee subjectively perceived as abusive or hostile."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367 (1993).  As the Supreme Court emphasized in *Faragher*, 524 U.S. at 788, "[w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."  Therefore, in order to establish the second element of a hostile work environment claim, Mrs. Smith must show that her workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Brooks v. CBS Radio, Inc.*, No. 08-1119,2009 WL 2482073, *4 (3d Cir. Aug. 14, 2009) (quoting *Nat'l R.R Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

20

East Penn argues that there is no basis for concluding that Mrs. Smith subjectively perceived Moser's comments and/or conduct to be insulting, humiliating, threatening or abusive or that they unreasonably interfered with Mrs. Smith's job performance, and that Mrs. Smith cannot establish that the conduct complained of was not unwelcome because she engaged in a longstanding, consensual sexual relationship with Moser. According to East Penn, Mrs. Smith willfully and voluntarily met Moser, both at work and outside of work over the course of eighteen months.

Mrs. Smith admitted she was scared to report the conduct, but not due to anything that Moser said or did. Mrs. Smith was afraid to report the conduct because she understood that having sex on company premises during work time was a violation of East Penn's Code of Conduct for which she could be terminated. Smith Dep., pp. 140-142. In fact, Mrs. Smith had the opportunity to discuss her affair with Moser on July 30, 2010, when she spoke with Alison Snyder in Human Resources to report the anonymous phone call to her husband, yet Mrs. Smith did not mention it to Snyder. Mrs. Smith testified about her conversation with Snyder on July 30, 2010, as follows:

> Q: Now, when you talked to Alison on July 30th, did you discuss with her about your affair with Mr. Moser?
>
> A: No.
>
> Q: Why not?
>
> A: I was ashamed, embarrassed, scared.
>
> Q: What were you scared of?
>
> A: Losing my job.

Q: Why were you afraid of losing your job?

A: That's very inappropriate behavior at the workplace.

Q: Oh.  So you were afraid of losing your job because you guys had sex in the workplace.

A: Right.

Q: Not necessarily the relationship but just that you had sex.

A: Right, right.

Q: But you didn't think to- I mean, you had oral sex elsewhere.  You didn't want to talk to her about- when I say her, Alison about the affair at all with or report Mr. Moser at all for his actions?

A: No.

Q: Why didn't you want to report Mr. Moser at that time?

A: I was ashamed.

Q: Any other reason?

A: Like I said, I didn't want to lose my job.

Q: And why did you think you were going to lose your job?

A: I'm sure the company doesn't want people having sex on their property.

Q: I understand.  But other than the location of the acts, I mean, why would you think that you would lose your job by reporting Mr. Moser?

A: It's not appropriate behavior.

Q: I understand that.  But did Alison ever say anything to you, did anyone ever in management suggest that you couldn't report a supervisor or co-worker for inappropriate behavior at the workplace?

A: No.

Q: So this was your own personal speculation that you would lose your job for

reporting Mr. Moser; is that accurate?

A: Yes.

Id. at 140-141.  East Penn argues that there is no evidence that Smith's job was affected by her affair with Moser, therefore Smith cannot establish as a matter of law that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment as required to establish a violation of Title VII.

Even if Mrs. Smith could establish that Moser's conduct was unwelcome, sufficiently severe or pervasive to alter the conditions of her employment, East Penn argues that the *Faragher/Ellerth* affirmative defense shields it from liability.  *Faragher* and *Ellerth* "hold that an employer is strictly liable for supervisor harassment that culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  *Pennsylvania State Police. v. Suders*, 542 U.S. 129, 137, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (internal quotations omitted).  When there is no tangible employment action, both decisions hold that an employer may raise an affirmative defense to strict liability for supervisor harassment: "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *accord Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  *See also Cardenas v. Massey*, 269 F.3d 251, 266 (3d Cir. 2001).

East Penn argues that the *Faragher/Ellerth* affirmative defense shields it from

hostile work environment employer liability for Moser's actions because it exercised reasonable care to avoid and eliminate harassment and that Mrs. Smith unreasonably failed to take advantage of opportunities provided by East Penn or to otherwise avoid harm.  It is undisputed that East Penn is an EEO employer, has policies regarding EEO that prohibit harassment, discrimination, and retaliation based on sex or gender.  It is undisputed that this anti-harassment policy was reviewed with Mrs. Smith during her orientation period soon after being hired and that she understood the policy; she also knew of the personnel department and how to contact that department.  Smith Dep., pp. 29-30.  Mrs. Smith never notified East Penn management staff of Moser's alleged harassment.  *Id.* at 101-102, 117.  She also did not discuss it with any co-workers, her husband or anyone outside of work.  *Id.* at 117.

An employer's remedial action is adequate "if it reasonably calculated to prevent future harassment." *Huston v. Proctor & Gamble Paper Product Co.*, 568 F.3d 100, 110 (3d Cir. 2009)(quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 412 n.8 (3d Cir. 1997)).  The employer cannot be liable if its remedial action stopped the harassment.  *Id.* (citing *id.*)  Regardless of whether the accused is a co-worker or a supervisor, an employer may avoid liability in a hostile work environment case if it takes appropriate remedial steps to confront the misconduct after being provided adequate notice of the alleged conduct. *Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  On October 26, 2010, East Penn learned for the first time of the alleged harrassing conduct through receipt of correspondence from Mrs. Smith's counsel enclosing her EEOC charge.  That same day,  Snyder and Robert Harrop, Vice President for Personnel at East Penn, separately interviewed Mrs. Smith and Moser.  As a result of East Penn's investigation, Moser was terminated less than twenty-four hours later.  Although Snyder believed

that Mrs. Smith's actions also violated East Penn's Code of Conduct because Mrs. Smith

admitted to engaging in sexual relations with Moser in the workplace, Mrs. Smith was not

terminated because East Penn feared a retaliation charge from her if it took such action.  At Mrs.

Smith's request, she was transferred to a first shift Floater position in Injection Molding Plant 2.

Approximately two years later, Mrs. Smith requested a transfer back to the Topton Distribution

Center on the more desirable first shift, and her request was granted.  Following Moser's

termination, there was no further contact between Mrs. Smith and Moser.

Throughout her deposition, Mrs. Smith repeatedly admitted that she never told

anyone about any comments made by Moser or Moser's conduct.  She kept the affair secret from

her co-workers and her husband.  It remained a secret even after she broke off the relationship

with Moser in June 2010.  Each of Mrs. Smith's co-workers deposed in this case denied having

any knowledge of the affair and found it incredible that any sex occurred in the workplace.

Mrs. Smith contends that the existence of the Code of Conduct is the only proof

which East Penn can point to which supports its claim that it exercised reasonable care to prevent

sexual harassment in the workplace.  Mrs. Smith states, without legal or record support,

> . . . . The evidence concerning Moser demonstrates that even if Defendant did not
> know about his conduct the law should impute to them such knowledge.
> Defendant's final assertion that Plaintiff is to blame for not availing
> herself of the corrective measures in place finds no support in the record.  Even if
> it is accepted that Plaintiff waited too long to complain, whether her actions in this
> regard were "unreasonable" is unquestionably a question of fact for a jury to
> decide.

Pl.'s Opp'n., p. 19.  Mrs. Smith argues, again without support, that East Penn has admitted

liability for Moser's conduct because Moser made an admission that he failed to abide by East

Penn's Code of Conduct which he was charged to enforce as a supervisor.  As East Penn

25

correctly argues, however, Title VII does not impose strict liability on an employer merely because the alleged harasser admits to the alleged harassing conduct.  Reply Br., p. 15.

When Mrs. Smith provided notice of the alleged sexual harassment four months after the affair with Moser ended, East Penn took immediate steps to investigate Mrs. mith's allegations.  As a result of East Penn's investigation, Moser was terminated within twenty-four hours of East Penn's receipt of Mrs. Smith's EEOC complaint.  Because the alleged harassment by Moser did not culminate in a tangible employment action against Mrs. Smith, East Penn is not strictly liable for any hostile work environment, but are instead entitled to raise the *Faragher-Ellerth* affirmative defense. The record establishes beyond any disputed material facts that East Penn acted reasonably to prevent and remedy any sexual harassment against Mrs. Smith, and that Mrs. Smith herself did not.  No reasonable jury could find otherwise.  The *Faragher-Ellerth* affirmative defense is thus satisfied, and East Penn is entitled to summary judgment on Mrs. Smith's Title VII claim for hostile work environment.  *See Ellerth*, 524 U.S. at 765.

> 2.    Whether Plaintiff Can Establish *Quid Pro Quo* Harassment.

To succeed under a *quid pro quo* theory of sexual harassment, a plaintiff must prove either that "(1) submission to [unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature] is made either explicitly or implicitly a term or condition of an individual's employment [or ] (2) submissions to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." *Kelleher v. Dunham D&M, LLC*, No. 08-05277, 2009 WL 3381562, *4 (E.D. Pa. Oct. 15, 2009) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 27 (3d Cir. 1997)).  "Not only must plaintiff

establish that defendant's conduct was unwelcome, she must also establish a causal link between

her response to the unwelcome advances and a subsequent employment decision." *Pergine v.*

*Penmark Mmgt Co., Inc.*, 314 F. Supp.2d 486, 492 (E.D. Pa. 2004) (citing Ellerth, 524 U.S. at

753, 118 S.Ct. 2257); *Farrell v. Planters Lifesavers Co.*, 206 FJd 271, 281 (3d Cir. 2000).

"Tangible employment actions" are those actions which are accompanied by "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits."

*Ellerth*, 524 U.S. at 761.

Mrs. Smith alleges that she was subjected to *quid pro quo* sexual harassment and

that she can prove her *quid pro quo* claim without the need to demonstrate a tangible

employment action.  Since Mrs. Smith does not have any direct evidence of discrimination, her

*quid pro quo* sexual harassment claim must be analyzed pursuant to the burden shifting

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973).  Mrs. Smith bears the initial burden to demonstrate a *prima facie* case of

unlawful discrimination.

East Penn moves for summary judgment of Mrs. Smith's *quid pro quo* claim on

the basis that Moser was not a supervisor, that his conduct was not unwelcome and that Mrs.

Smith cannot prove a tangible employment action.  For purposes of this analysis, however, we

need not examine East Penn's first two arguments because the evidence of record shows that

Mrs. Smith cannot establish that she suffered any tangible employment action, which, despite her

contention to the contrary, is required for Smith to establish a *prima facie* case of *quid pro quo*

sexual harassment.  *Farrell*, 206 F.3d at 281-82; *See also Kress v. Birchwood Landscaping*, No.

27

3:05-cv-566, 2007 WL 800996, *2 (M.D. Pa. Mar. 14, 2007) (requirement of a tangible

employment action in *quid pro quo* cases is "well established"); *Schepis v. Raylon Corp.*, No.

03-cv-5970, 2006 WL 2803050, *2 (E.D. Pa. Sept. 26, 2006); *Hobson v. Campola*, No.

02-cv-362, 2005 WL 2656688, *2 (D. N.J. Oct. 18, 2005) (if plaintiff can neither show

submission to sexual advances nor a tangible employment effect as a consequence of refusing a

sexual advance, the plaintiff cannot bring a *quid pro quo* claim); *Lapenta v. City of Philadelphia*,

No. 03-cv-518, 2004 WL 1656607, *3 (E.D. Pa. July 23, 2004) (the plaintiff "must provide

evidence that [the defendant] took some form of adverse employment action against [her]").

There is no evidence to suggest that Mrs. Smith's willingness to submit to or

reject Moser's advances was a factor in any decision that affected her employment.  Mrs. Smith

admitted, and there is no record evidence to the contrary, that her submission to the sexual

relationship with Moser was neither explicitly nor implicitly a term or condition of her

employment.  Smith Dep., pp. 110, 118-119.  At deposition, Mrs. Smith testified:

> Q:  How if it did, maybe it didn't, did the relationship ever change from January
> of '09 until December of '09?
>
> A: No.
>
> Q: No change.  How about from December '09 until June 2010, did the
> relationship change at all between you two?
>
> A: Towards the end, yes.
>
> Q: But prior to the relationship ending, did Mr. Moser ever tell you you had to
> sleep with him or you would lose your job or –
>
> A: No.
>
> Q: Did he threaten you in any way?

28

A: No.

Q: Did you guys talk about work when you were having your meetings at all or arranging your meetings?

A: In what way?

Q: About your job performance, about, you know, if I go to a meeting I won't be able to finish my production level, did you have any discussions about your work and whether or not your being absent from the work area affected your job performance?

A: Yes.

Q: And what were those discussions?

A: Well, not all the time but –

Q: Okay.

A: But it depends on what job we were doing at the time, I'm like I just can't get away, you know, I'm required to be there and I have to do my job so . . . .

Q: And so you would just not go then?

A: Right.

Q: So you turned him down on a couple occasions because it would have affected your job?

A: Right, yes.

Q: And what if anything did Mr. Moser say or do when you'd turn him down?

A: Just say why didn't you meet me.

Q: So you would leave him at a particular place and just not show up?

A: If I knew I couldn't get away, yes, yes, and there were times I did say no.

Q: Okay.  Well, tell me about – so there are a couple – how many times did you just not show up to the arranged meetings?

A: I'm going to guess, at least three times.

Q: And how many times did you say, no, I don't have the time?

A: I'm going to guess maybe four times, five times.

Q: You noted in the Complaint that Mr. Moser was the sexual aggressor on each and every occasion.  Is that accurate?

A: Can you repeat that again, please.

Q: Let me just show you paragraph 14 says that Mr. Moser on each and every occasion was the sexual aggressor.

A: Yes.

Q: Okay.  Yes, what does that mean, each and every time he was or do you mean yes, you just read that?

A: Oh, yes, he was the aggressor.

Q: What does that – what do you mean by he was the sexual aggressor?

A: Well, usually he's the one who initiated the sexual contact.

Q: But you participated; correct?

A: Yes.

Q: And you could turn him down, correct?

A: Yes.

Q: And when you wouldn't show up or you told him no, did he take any sort of job action against you?

A: No.

                                    . . . .

Q: Now, in the Complaint you allege that you felt that because of Mr. Moser's position as your superior, you had no choice but to submit to his sexual requests. Why did you believe that you had no choice?

A: My mental state at that time.

Q: What does that mean?

A: I was very fuzzy and unclear, and I was used to being controlled.

Q: What does that mean used to being controlled?  Was your husband controlling?

A: Yes.

Q: Anyone else controlling in your life?

A: No.

Q: Okay.  So was there any other reason you felt – other than your mental state.  Was there any other reason that you felt like you had no choice?

A: And the alcohol abuse and all of that, it made me very abnormal let's say.

Q: What does that mean?

A: I definitely was not – when you're an alcoholic, you make a lot of choices that you normally would not make –

Q: Okay.

A:  – if you were thinking clearly.  And with the mixture of the alcohol and the medications, it makes you a totally different person.

Q: You felt that that was what was happening at this time?

A: Yes, I do.

Q: But when you say you felt like no choice, it wasn't because Mr. Moser said anything to you, was it?

A: Like what do you mean.

Q: Well, did Mr. Moser ever tell you that you have to, you know, have oral sex with me to keep your job or –

A: No.

Q:  – threaten you in any way regarding your employment?

A: No.

Q: Okay.  So you felt like you had no choice, it was all personal due to your medications and the alcoholism, correct?

A: Yes.

Q: Okay.  Did you go to rehab at any time during this period January of '09 until June of 2010?

A: Yes, I'm not sure the date.

Q: December of '09?

A: Yes, yes.

Q: And would it be White Deer Run?

A: Yes.

Q:  Were you there at that time?

A:  Yes.

Q:  And how successful was your treatment there when you left White Deer Run?

A:  Temporary.

Q:  How long did it last?

A: From December I would say approximately three or four months.  It wasn't very long.

Q: So during this three month period of sobriety, did you continue to engage in the relationship with Mr. Moser?

A: Yes.

. . . .

Q:  According to the Complaint, you broke off the relationship in June 2010; is

that accurate?

A: Yes.

Q: Did you break it off or did Mr. Moser or how did it come about to break off?

A: There wasn't an actual break up.

Q: Oh.

A: I just like stopped bothering with him by then.  I mean, we never said, hey, we're done or anything like that.

Q: Was he upset or angry?

A: Not to my knowledge.

*Id.* at 110-112, 117-120.  Perhaps the greatest evidence against Mrs. Smith's claim for *quid pro quo* sexual harrassment is the fact that she is still employed by East Penn.  In December, 2010, when Mrs. Smith requested a transfer from the Topton Distribution Center, East Penn accommodated her request and transferred her to a first shift Floater position in Injection Molding Plant 2.  In April, 2012, she requested and was granted a transfer back to the Topton Distribution Center to a first shift position on the Dry Line as a battery labeler/packager, her previous job at that location.  Because Mrs. Smith fails to identify a tangible employment action due to her submission to or rejection of sexual favors with Moser, her claim for *quid pro quo* sexual harassment fails and East Penn's motion for summary judgment must be granted.

**B.    Pennsylvania Human Relations Act Claim.**

The United States Court of Appeals for the Third Circuit has held that the proper analysis of discrimination claims under the Pennsylvania Human Relations Act ("PHRA") is identical to the analysis under Title VII.  *Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir.

2001)(noting Pennsylvania courts have construed protections of Title VII and PHRA acts interchangeably).  For the reasons set forth above, I will grant East Penn's motion for summary judgment on Smith's PHRA claim.

An appropriate Order follows.